**QUICK ACTION IGNITION CO. et al. v. MAYTAG CO.**

No. 8555.

Circuit Court of Appeals, Eighth Circuit.

Feb. 20, 1930.

Rehearing Denied May 3, 1930.

A. C. Paul, of Minneapolis, Minn. (Howard M. Cox and Cheever, Cox & Moore, all of Chicago, Ill., and Ralph Orwig, of Des Moines, Iowa, on the brief), for appellants.

William H. Davis, of New York City (George E. Middleton, of New York City, on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and MILLER, District Judge.

STONE, Circuit Judge.

This is an action for infringement of three patents. The trial court found patent Oglesby No. 1,279,750 valid but not infringed and patents Oglesby No. 1,300,637 and No. 1,390,376 invalid. From a decree dismissing the bill, this appeal is brought.

All of these patents relate to a fly wheel magneto designed to furnish electrical energy in the operation of gas engines. The main patent is No. 1,279,750, which is for a magneto. Patent No. 1,300,637 is for an arrangement permitting access to the parts of the above magneto, and patent No. 1,390,376 is for a speed governor thereon to control non-load conditions.

Patent No. 1,279,750.

This is a combination patent. The question is whether it should be allowed a range of equivalents which will include the device used by defendant. This requires determination of the scope and extent of novelty disclosed by the patent and of a restriction by estoppel claimed to be shown in the file wrapper.

The power source in gas engines is explosions of gas (within cylinders) ignited by an electric spark. The more intense this spark, the more perfect the explosion. The intensity of the spark depends upon the intensity of the electrical current producing it. One method of supplying this current is from a magneto. A magneto is a magnetic-electric unit which generates electrical energy and places it on a conductor carrying to the spark plug in the gas cylinder. The main elements of a magneto are a permanent magnet and an armature. A magneto generates the current by arousing and concentrating a magnetic flux in the permanent magnet and passing that flux to the armature, from which it flows by conductors to the spark plug. The current originates in the magnet, and only such current as can be so originated and passed therefrom into the armature is available for use. The method of developing current in a magneto is to have a permanent magnet and an armature pass close to each other. This generates and develops the magnetic flux in the magnet which flows from its poles, or ends, into the armature coil. To produce this result, either the armature or the magnet may be fixed while the other revolves.

The ultimate purpose of Oglesby was not merely to produce a spark but to produce an *intense* spark. Such intensity was his aim. This he sought to do by intensifying the current produced in and transmitted from a magneto. Since the intensity of the usable energy produced in a magneto depends upon the intensity of the magnetic flux aroused in the magnet and transmitted by it to and received by the armature, his problem was a magneto so constructed that, in its operation, there would be "a sudden forced building up of a dense magnetic flux through the armature coil." Patent, p. 1, line 21.

His method and structure for working out the above result was as follows. He employed the well-known type of magneto where the magnet revolved in relation to a fixed armature. His improvements thereon were designed to effect an arrangement of parts which would bring about a unique sequence of results culminating in a more intense current to be transmitted to the spark plug. These results were produced "through the medium of a short air gap [in the magnet] active at a large distance from the center of rotation [of the magnet]; the entire bridging of the air gap in advance of coil induction; suddenly sweeping a unidirectional flux across the coil under a shorter time constant than is possible when the flux is reversed; and in subjecting more turns of the coil to induction due to an increased coil space provided under projecting heads without sacrificing the bridging effect." Patent, p. 2, line 116.

To secure the "short air gap active at a large distance from the center of rotation" of the rotating magnet, he employed a cir-

cular permanent magnet secured to the outer portion of a flanged disk support fastened to a revolving shaft driven by the gas engine to which the energy was to be supplied. This gave him the maximum rotation of the magnet, and thereby the greater opportunity to develop magnetic flux by rotation of the magnet. He made the magnet ends of highly permeable pole pieces which resulted in concentration of magnetic flux therein, when the magnet was revolved.

The armature was secured to another disk with suitable space between it and the magnet. This disk was practically stationary, being subject only to "rocking" for the purpose of advancing or retarding the spark. The armature pole heads were on the same side of the center of the disk and of the coil or coils, and they projected toward each other. This arrangement of the heads upon the same side of the disk center secured the unidirectional flux—desirable because it produced a more sudden and intense peak at slow speeds of magnet rotation. The projection of the heads toward each other gave, also, a larger space around the armature core, which space was utilized by more windings of the coil or coils, thus giving increased receptivity to the flux transmitted from the magnet. Also the projection of the heads toward each other enabled a shorter air gap to be used in the magnet, resulting in a more rapid and increased flux variation for each revolution of the magnet.

Another important feature is the lengths of the permeable magnet pole pieces, of the magnet air gap, of the outer face of the pole heads of the armature, and of the space between such pole heads. All of these lengths are the same, or practically so. The value of this is to secure a momentary short circuit of the flux leakage as an armature head spans the magnet gap just before the magnet pole is swept across the armature coils, thus enabling the full force of the flux to sweep across the coils immediately afterwards.

Thus an increased magnetic flux is developed by a large rotation and small air gap of the magnet; this flux is concentrated in the magnet pole pieces by making those pieces of highly permeable material; the lengths and arrangement of magnet air space, magnet pole pieces, and armature heads is such as to momentarily short circuit leakage and enable the full force of the flux to suddenly and strongly flow into the coils; those coils are increased in winding so as to take up the flux and generate a stronger current; the flux is unidirectional. Summarizing, the purpose and result is to develop an intense magnetic flux in the magnet and to transmit such flux, suddenly and with minimum loss, to the generating armature, where it is transformed into intense current ready for transmission to the spark plug. The record convinces that Oglesby's magneto was highly effective and useful.

■ It seems logical to determine first just what Oglesby was granted by his patent while it was in course in the patent office. No matter what he had invented, the grant of his patent must be limited to the claims therein and the first measurement of the breadth of those claims must be what took place in the patent office in direct connection with such grant. He cannot broaden the scope of the claims to secure something shown to have been denied him by such proceedings in the Patent Office. I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 443, 47 S. Ct. 136, 71 L. Ed. 335; Weber Electric Co. v. Freeman Electric Co., 256 U. S. 668, 677, 41 S. Ct. 600, 65 L. Ed. 1162, and the following cases in this court: R. H. Buhrke Co. v. Brauer Bros. Mfg. Co. (C. C. A.) 33 F.(2d) 838, 839; Knick v. Bowes, etc., Corp. [C. C. A.] 25 F.(2d) 442, 446. If he is not satisfied with the action of that office, he has a remedy to test his rights therein. If he accepts the patent, his claims are bounded by any limitations shown in such proceeding.

There are twelve claims. In all except claim 11, one feature of the combination is armature pole heads "projecting toward each other" or projections on such heads which "extend toward each other"—this is variously expressed, but carries the same meaning. Claim 11 is very broad in its statement, but is obviously intended to cover a "series" of armature heads of the type described in the other claims rather than to eliminate such feature.

The file wrapper shows the following: The patent papers were filed in the office February 17, 1916. There were ten claims originally. Each of them was quite broad and general. The Examiner rejected all claims except claim 1, citing Durbin No. 1,-022,832 against each of such and, as to several claims, other patents. Claim 1 was as follows:

"1. A circular permanent magnet having an air gap therein and pole pieces placed on each side of said air gap, an armature coil, a core therein, pole heads projecting therefrom, and means for periodically bridging the field magnet's circumferential air gap by both armature poles and core simultaneously and by either armature pole, singly in alternating sequence through the movement of the field magnet."

598

As to claim 1, the Examiner said:

"Claim 1 is believed to be met by Wilkins, 361,737, April 26, 1887 (Hand Mach); Dinkins et al., 1,014,622, Jan. 9, 1912. (123–149) Spr.; Retchenbach, 778,707, Dec. 27, 1904, Bip. Sparkers; Durbin, 1,022,832, April 9, 1912. (123–149.)

"In each of the first three patents cited, it will be noted that the armature pole pieces are adapted to bridge the air gap at the time of the theoretical reversal of flux in the armature winding; this being the usual construction in machines of this type. In the Durbin structure the operation is somewhat different, although there can be no doubt from the drawing that the armature pole pieces are intended, not only to bridge the gap between the field magnet pole pieces, but overlap the gap an appreciable amount at certain points in the movement of the magnet."

In the response to this action of the Examiner, "and in confirmation of an interview of November 14, 1916," amendments were filed. The only material amendment of the specifications was, after the statement, "The armature pole heads 3 are cut under at 9 to secure an increase of winding space," to add, "which at the same time admits of a reduction in the distance between the ends 35 and 36 so as to span pole pieces 2 and also permit a head 3 to reach across space 6, thus securing the much desired momentary short circuiting of the flux before it is swept across the armature coils. By omitting the projection from heads 3 the relation of parts shown in Fig. 4 would be secured with a corresponding loss in efficiency. Thus, by having the projections on one side only of the core 4 so as to extend toward each other, special advantages are gained." The material changes in the claims were as follows: In claim 1 (above quoted), after "an armature coil, a core therein, pole heads projecting therefrom" was added "and extending toward each other on one side of the core only."

Claim 2, reading: "2. A series of independent armature coils, a movable field magnet having a circumferential air gap, pole heads extending from the armature coils and projecting toward each other adapted to singly span the field air gap, means for producing movement of the armature coils and the magnet with respect to each other whereby and means for independently utilizing the separate currents generated in the armatures," was changed to read: "A series of independent armature coils, cores therefor, a circularly shaped movable field magnet having a circumferential air gap, pole heads extending from the armature coils and projecting toward each other adapted to singly span the field air gap, means for producing movement of the armature coils and the magnet with respect to each other whereby independent currents are generated in the separate armatures."

In claim 3, "A series of armature coils having suitable poles for each coil" was changed to "A series of armature coils having suitable *projecting and approaching* poles for each coil"—the insertion being here italicized. In claim 4, "an armature having a coil, core and pole heads projecting, from the core" was changed to "an armature having a coil, core and pole heads projecting from the core and advancing toward each other." In claim 5, after "an armature coil, its core, and heads projecting from the core" was added "and extending toward each other on one side of the core only." In claim 6, "an armature coil, its core, and heads projecting from the core" was altered by changing the last words, "the core," to "and extending toward each other on one side of the core." In claim 7, "a coil, a core and heads projecting from the core secured to said support" was changed by inserting between "core" and "secured" the words "toward the path of travel of the magnet and extending toward each other and,² and, after the word "projecting," the word "outward." In claim 8, after "a coil and a core with its heads" was added "that project outward and toward each other." In claim 9, after "a coil, a core and heads to said core supported thereby" was added "and projecting outward and toward each other more on one side of the core axis than on the other." In claim 10, after "armatures having cores, coils and pole heads secured to a suitable support" was added "and to the cores, the heads having projections which partly enclose the coils on one side of the core and also reduce the air gap between them while the coil space adjacent the projections and the core is increased in length to accommodate a greater number of turns in the coils."

Regarding the above changes in the original claims, the response, under "Remarks," states (italics inserted):

"It is believed the claims as amended point out the differences recognized at the last interview at which time the file wrapper citations against Durbin, the nearest reference, were also considered. These were

| #915,390 Varley | 359,552 Bassett |
| 732,365 Mears et al | 608,896 McInery |
| 914,532 Thordarson | 744,573 LePontois |
| 794,117 Remy | |

"The citations of the last action were also considered in detail and the fundamental differences of applicant's structure noted. *The specific feature on which this difference rests lies in the armature heads which project to one side of the core and toward each other so as to reduce the distance between them and at the same time increase the winding space.*

"The ordinary extent of heads as found in shuttle armatures for instance C of Wilkins could not produce applicants results because the relation of winding space *to the approach of heads toward each other* is the same. In armatures of the shuttle armature type the windings most usually fill the entire space so that the heads do not project beyond the windings perpendicular to the axis of the core. See Wilkins Figs. 3 and 5; Dinkins Fig 5; Durbin Fig. 1 and Thordarson Figs. 1, 4 and 6.

"Reichenbach in his Fig. 1 shows heads a2 that project beyond the winding d but since Figs. 1 and 2 are obviously *liberally diagrammatic* this relation cannot be taken seriously. In practice armature magnets of the required size for magneto purpose are found to seldom exceed 3 inches in length while the diameter of the winding, Fig. 1 is shown the same as the outside diameter of the engine Cylinder a relation that manifestly has no counterpart in practice."

Two new claims (11 and 12) were added.

The second response of the Examiner rejected claims 3, 4, 6, and 7; suggested minor changes in claim 10, and made no allowance of any claims. As to amended claim 3, the Examiner said (italics inserted):

"*In its present form claim 3 is too* indefinite *as to the shape of the poles, for it is by this specific feature alone that* the structure intended to be covered by this claim in any way distinguishes over Durbin, of record. The claim is also incomplete in that it provides no structure for the projecting or approaching poles, the armature coils not necessarily including anything more than the mere winding. Claim 3 is again rejected."

Applicant submitted new claims 3, 4, 6, and 7. The third response of the Examiner rejected new claims 4, 6, and 7. As to 4 and 6, the Examiner said:

"Claim 4 is also rejected as being unpatentable over Reichenbach, of record, in view of the fact that it is old, as in Remy, for example, to extend the armature heads toward each other.

"Claim 6 is rejected for the same reasons as claim 4, there being no new or different result produced by merely cutting off a portion of the projections of the armature heads on one side.

"This claim, as well as claim 4, failed to set out the necessary structure whereby a unidirectional flux only threads the winding."

To this the applicant responded taking decided issue with the Examiner. He begins by saying: "Applicant does not admit the allegations of the Hon. Examiner that his use of overhanging heads is not patentable because of Reichenbach and Remy. The Hon. Examiner's further allegation that no new result is produced by 'merely cutting off a portion of the projections of the armature heads on one side' is also not admitted. Applicant certainly does produce results that neither of the citations alone or combined with each other can produce at a minimum rate of rotative speed."

Further he says: "The allegation of the Hon. Examiner that no advantageous effect is produced by having the armature heads project on one side only is untenable. Suppose that either Reichenbach or Remy adopted applicant's structure no practical results would be secured because of the unsymmetrical electrical and unbalanced mechanical relation of the heads to the reversal of flux in the armature during each revolution."

Also: "The only practical way in which to secure a unidirectional flux condition is to place both armature heads on one side of the center of rotation, hence in an armature with overhanging heads on one side of the coil only the heads being located on opposite sides of the center of rotation as in Figs. 1 and 3 of Exhibit D the coil will be subject to a reversal of flux regardless of whether the armature or field magnet is rotated. So then cutting off the overhanging heads on one side only of the Remy armature cannot be considered an equivalent of applicant's structure."

He suggests an extended amendment to the specifications in which he states the outstanding feature of his invention to consist in the production of unique results based upon overhanging armature heads upon the same side of the center of rotation, and concludes with: "The use of overhanging armature heads adapted to completely bridge the field air gap and a non-reversing flux induction with maximum coil space are claimed in their broadest aspect without being limited to specific expedients of construction or adaptations to meet the varying exigencies of actual practice in largely differing industrial applications."

He then amended his new claims 4, 6, and 7 to accentuate the overhanging and approaching armature heads on the same side of the core. The Examiner seems to have been convinced, and, after some further proceedings, the patent issued on September 24, 1918.

The above proceedings in the Patent Office convince that this patent was allowed and accepted only upon the conclusion that an essential element of novelty in the combination was the overhanging armature core heads which approached or extended toward each other on the same side of the armature core. To a combination with that element so limited the patentee is therefore bound.

■ So limited, was this patent infringed by defendant's device? An examination of the device of defendant shows that it has projecting and enlarged armature core heads, but there is no projection thereof over the side of the armature core. The entire head is at the end of the core. To secure the desired peripheral surface thereof the head is extended slightly above, but not over, the outer edge of the armature, and is dropped downward to about one-half way of the armature below the core. This feature of each is best understood by illustration, as follows:

Defendant's device.

This difference is decisive, under the limitations of the patent. There is no infringement of this patent by defendant's device.

### Patent No. 1,300,637.

■ This patent is for an opening and opening cover in the casing around the magneto. Its purpose is to afford ready access to the magneto parts—particularly to the circuit breaker and condenser. It consists merely of an opening suitably located in the flywheel casing of the magneto and an ordinary covering therefor. While the patent is framed as a combination patent covering the entire magneto and casing, yet the novel feature claimed in the combination is this opening and cover. This record shows there was nothing new in making a covered opening through which to reach parts requiring removal or adjustment. Such a need is obvious. Equally obvious is the remedy of cutting an opening and placing a cover thereover. If the prior art had been vacant, this need and remedy would have been clear to any mechanic. There is no novelty therein, and the patent is invalid for lack of novelty.

### Patent No. 1,390,376.

■ This patent is for an automatic speed governor for gas engines. Its mode of operation is to cut off spark plug current at excessive speed and restore it when the speed is reduced to the proper rate. It is designed to operate "either mechanically or electrically." Patent p. 1, line 20.

The drawings illustrate four differing constructions. Three of the illustrations relate to governors which act mechanically upon the circuit breaker. The fourth relates to a governor which acts to ground the current. The mechanically acting devices are single lever and compound lever, and also those wherein the cam and the lever-weight move in the same as well as in opposite radial directions. All are based upon a governor attached to a revolving magnet support which acts through centrifugal force.

There are two claims which are quite broad.

In claim 1, the expression is for "a centrifugal governor carried in unison with the

Plaintiff's device.

field magnet movement, and means controlled by the governor for automatically depriving the spark plugs of current at excessive engine speeds and restoring the same at lowered speeds."

In claim 2, the expression is for "a centrifugal governor carried in unison with the field magnet movement, and means for automatically controlling the ignition circuit through the action of the governor, said means being arranged to deprive the ignition circuit of current at excessive engine speeds and restore the current at lowered speeds."

The method of the mechanically acting devices illustrated is as follows: The type of magneto to which the devices apply is that of a permanent field magnet fixed to a circular plate rotating on a shaft closely adjacent to an armature on a similar plate which is stationary, or practically so. Attached to the primary coil of the armature is a circuit

breaker which is operated by a cam attached to the magnet plate. The circuit is normally open, but is closed once in each revolution of the magnet plate by the cam. One feature of Oglesby's plan was to use a governor which would, under excess speed conditions, slightly withdraw this cam toward the shaft, thus causing it to miss the breaker shoe, and therefore not close the circuit. So long as the circuit remained open, there could be no ignition at the spark plugs. The other feature of his plan was to withdraw this interference with the cam and the consequent circuit breaking as soon as the speed became normal. These results he accomplishes through governor devices, with weights, acting centrifugally.

His governor which acts electrically is independent of the cam. The method there is to ground the current before it reaches the spark plugs, when the engine speed is excessive. This method he illustrates by a ring which is insulated on to the armature plate and attached to the primary coils and a centrifugally acting lever, with a contact shoe, attached to the magnet plate. Normally, this governor is inactive. Excessive speed actuates the lever and causes the shoe thereon to contact with the ring on the armature, thus grounding the current from the coils and depriving the spark plugs of current. As soon as the speed reduces to normal, the governor becomes inactive and the shoe leaves the ring.

Certainly, these devices are useful. The trial court found such governors were old, and therefore the patent was invalid. Thirteen patents are introduced. They show that engine speed control through spark control was old, and that governors of various designs existed to eliminate the spark during excess speed and restore it when normal speed returned; that many of these governors operated by centrifugal force from the flywheel or from the engine shaft to which they were attached; that some had to do with magneto generated current; that some were attached to parts of the magneto; that one (Warren, No. 1,261,079) operates upon a cam. All of these show a field well occupied by devices intended to accomplish the same end by use of the same general means. However, none are close enough to completely anticipate this Oglesby device. The patent is valid, but must not be given too wide equivalents. Claim 2 is for a combination which includes the Oglesby's magneto (Patent No. 1,279,750) and this governor device. It seems to us that claim 1 is also a combination claim, although it is not argued here, but appellant stands on claim 2. We think this claim is valid. From an ex-

amination of defendant's device, this governor therein seems very similar to that of Oglesby. However, the claim is for a combination, and, if the lack of overhanging armature core heads prevents defendant from infringing the magneto patent, the same reason would prevent infringement of a combination of that magneto and any governor. We think this patent should be held valid but not infringed.

The decree should be modified to find the governor patent valid but not infringed, and, as so modified, should be, and is, affirmed.